UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MALAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MARTINEZ REFINING COMPANY LLC,<br><br>Defendant. | Case No. 23-cv-04184-HSG<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 83 |

Pending before the Court is Plaintiff David Malan's motion for class certification. Dkt. No. 83. The Court held a hearing on the motion, and now **DENIES** it.

## I. BACKGROUND

This is one of several related cases filed in this district against Defendant Martinez Refining Company, LLC ("MRC" or "Defendant").[1] MRC owns and operates an oil refinery in Martinez, California, that processes crude oil into gasoline and jet fuel. *See* Dkt. No. 69 ("FAC") at ¶¶ 2, 14, 20–37. The refinery is surrounded by residential properties. *See id.* at ¶ 15. Plaintiff alleges that Defendant emits large quantities of particulate matter as a result of its operations. *See id.* at ¶¶ 23–28. Specifically, Plaintiff contends that the refinery's Fluidized Catalytic Cracking Units ("FCCU") are a major source of its particulate emissions, including petroleum coke and spent catalyst, byproducts of the oil refining process.[2] *See* Cal Report at 5; FAC at ¶¶ 26–28.

---

[1] These cases include the above-captioned case, *Malan*, Case No. 4:23-cv-4184-HSG; *Cruz v. PBF Energy, Inc.*, Case No. 23-cv-06142-HSG; *Frye v. Martinez Refining Company LLC*, Case No. 24-cv-04506-HSG; *Saliba v. Martinez Refining Company LLC*, Case No. 24-cv-08153-HSG; *Silvestri v. Martinez Refining Company LLC*, Case No. 24-cv-08241-HSG; *Manning v. Martinez Refining Company LLC*, Case No. 24-cv-08316-HSG; and *Canning v. Martinez Refining Company LLC*, Case No. 25-cv-04511-HSG. They are all currently coordinated before this Court for resolution of common issues. *See* Dkt. Nos. 109, 113.

[2] As explained by Plaintiff's expert, Dr. Mark E. Cal, "[t]he FCCU units use a fluidized catalyst to

1    Additionally, Plaintiff alleges that Defendant creates a substantial amount of wastewater, which

2    "is noxious and highly odiferous" if not properly handled. *See* FAC at ¶ 30.

3          Defendant currently uses electrostatic precipitators ("ESP") to filter out particulates from

4    its emissions. *See id.* at ¶ 35. But Plaintiff contends that ESP is not the best available technology,

5    and that regulators recommend Defendant use wet gas scrubbers instead. *See id.* at ¶¶ 35–37.

6    Although not specifically requiring such technology, Plaintiff points out that in 2021 the Bay Area

7    Air Quality Management District ("BAAQMD"), which regulates MRC, amended Rule 6-5. *See*

8    Dkt. No. 83-7, Ex. 7; *see also* FAC at ¶ 33. The Rule seeks to reduce the amount of total

9    particulate pollution released from FCCU units, prohibits refineries from exceeding certain limits,

10   and imposes monitoring requirements. *See* Dkt. No. 83-7, Ex. 7. However, Plaintiff contends that

11   Defendant has yet to come into compliance with Rule 6-5.[3] *See* FAC at ¶¶ 34–35; Dkt. No. 83 at

12   3.

13         Rather, Plaintiff documents repeated emissions incidents at the refinery. *See* FAC at

14   ¶¶ 48–49, 54. Plaintiff contends that BAAQMD has repeatedly issued Notices of Violations to

15   Defendant, including for odor and dust nuisance. *See id.* at ¶ 49; *see also* Dkt. No. 83-8, Ex. 8

16   (sample Notices); Dkt. No. 83-9, Ex. 9 (Notice logs); Dkt. No. 83-10, Ex. 10 (Notice logs).

17   Plaintiff contends that these are therefore not isolated incidents, but a pattern and practice of

18   Defendant's ongoing operations. *See* FAC at ¶¶ 38–45, 49–57.

19         By way of example, Plaintiff describes a particularly acute incident. In November 2022,

20   MRC released an estimated 20–24 tons of spent catalyst after an FCCU unit "upset" that disabled

21   the ESPs for several days. *See id.* at ¶ 49; Dkt. No. 83-13, Ex. 13 (internal MRC email noting

22   community complaints and lab results finding material consistent with catalyst); Dkt. No. 83-12,

---

crack crude petroleum into lighter hydrocarbons used to make marketable fuels, such as gasoline and jet fuel. *See* Dkt. No. 83-4, Ex. 4 ("Cal Report") at 5. This process produces petroleum coke and "spent," or deactivated, catalyst. *Id.*; *see also* FAC at ¶¶ 26–28.

[3] Defendant filed a lawsuit in state court against BAAQMD regarding Rule 6-5, which it settled in February 2024. *See* Dkt. No. 83-11, Ex. 11. Under the settlement agreement, Defendant stated that it is implementing changes to reduce its total particulate emissions from its FCCU and come into compliance with Rule 6-5, including installing a monitoring system. *See id.* at 2–3. It will be required to show compliance using its new monitoring system beginning in the July–September 2026 calendar quarter. *Id.* at 3.

1  Ex. 12 (BAAQMD Summary Report). Investigators observed "visible dust" at various locations
2  within Plaintiff's proposed class area. *See id.* at 2–4. BAAQMD also conducted air quality
3  modeling "to help define areas likely impacted by deposited catalyst material" and to "inform
4  future soil sampling." *See id.* at 5–7. The model predicted that catalyst material was deposited in
5  the "main area" extending about 8km to the west-southwest of the MRC in concentrations
6  exceeding 0.1 grams per square meter ("$g/m^2$"). *See id.* at 7. In March 2023, Contra Costa Health
7  Services ("CCH") issued a health advisory, recommending that "no one consume fruits or
8  vegetables grown in soil exposed to substances released on November 24 and 25, 2022." *See* Dkt.
9  No. 83-16, Ex. 16. CCH stated that it had no evidence of a health risk associated with the
10 incident, but made the recommendation "out of an abundance of caution." *See id.* The advisory
11 was lifted in June 2023 after testing results found that the spent catalyst "did not increase the
12 public's risk of exposure to hazardous metals in the soil." *See* Dkt. No. 83-17, Ex. 17 at 3. But
13 CCH continued to identify other incidents, including 21 "releases or spills of hazardous materials
14 at the Martinez refinery" in 2023 alone. *See* Dkt. No. 83-18, Ex. 18.

15 In short, Plaintiff alleges that MRC has repeatedly failed to implement appropriate
16 emission control practices to prevent particulate matter and "noxious odors" from migrating offsite
17 and onto the surrounding residential properties. *See* FAC at ¶¶ 1, 17–18, 35–44, 50, 57–58, 83–
18 85, 100, 102–03, 106, 113. Plaintiff further alleges that the odor and particulate matter caused
19 Plaintiff and putative class members harm, and interfered with their comfortable use and
20 enjoyment of their residential properties. *See id.* at ¶¶ 85, 88, 104, 115.

21 Plaintiff provides some examples of this interference, such as causing putative class
22 members to remain inside and keep doors and windows closed; spend considerable time and
23 money to clean and repair the dust on their property; sustain damage to their property in the form
24 of "chipping, pitting, sedimentation, corrosion, destruction, and waste to the gardens, lawns, soil,
25 and other flora" and lost property value; and lose the exclusive possession of their properties. *See*
26 *id.* at ¶¶ 85, 115. Plaintiff also alleges that the odor and dust causes Plaintiff and putative class
27 members "annoyance, discomfort, embarrassment, and reluctance to invite guests to their homes."
28 *Id.*

Based on these allegations, Plaintiff alleges four causes of action under California law: (1) public nuisance; (2) private nuisance; (3) negligence; and (4) trespass. *See id.* at ¶¶ 82–116. Plaintiff now seeks to represent a class defined as:

> All owner-occupants and renters of residential property located, in whole or in part, within one mile (1.0) Defendant's Refinery, located at 3485 Pacheco Boulevard, Martinez California, from August 16, 2020 to the Present.

*See* Dkt. No. 83 at 2.[4]  Plaintiff estimates that this includes approximately 3,761 residential households. *See* Dkt. No. 83-28, Ex. 28 at ¶ 8.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 23(a) provides that a district court may certify a class only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).  That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022).

If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Rule 23(b)(3) applies where there is both "predominance"

---

[4] Unlike in the other related cases, Plaintiff here only seeks to recover for property damage and does not raise any toxic tort or personal injury claims. Both in his briefing on the motion for class certification and during the hearing on the motion, Plaintiff has repeatedly emphasized the relatively narrow scope of this case as compared to the others. He also has stressed the logistical difficulty in resolving this case and those of putative class members if a class is not certified here. But as the Court explained at the hearing, there are overlapping core issues across these cases that will be resolved on a coordinated basis regardless of the outcome of this motion.  The denial of class certification, therefore, will not doom the parties (and the Court) to litigating thousands of cases without any coordination.

4

and "superiority," meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To determine whether a putative class action satisfies the requirements of Rule 23(b)(3), courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D). Plaintiff, as the party seeking certification, "must affirmatively confirm" his compliance with Rule 23 by a preponderance of the evidence. *See White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (quotations and citations omitted). To do so, Plaintiff "must actually *prove*—not simply plead—that [his] proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Id.* (quotation omitted) (emphasis in original).

## III.   DISCUSSION

As discussed at the hearing on the motion, the key dispute among the parties—and for the Court's consideration—is whether Plaintiff has met the predominance requirement under Rule 23(b)(3). The Court therefore begins its analysis with predominance, rather than the Rule 23(a) factors.

### A.   Predominance

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted). When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3)

5

even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* The Supreme Court has defined an individual question as "one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (quotation omitted). This "inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quotation omitted). The Supreme Court has made clear that Rule 23(b)(3)'s predominance requirement is "even more demanding" than the commonality requirement of Rule 23(a). *See Comcast*, 569 U.S. at 34 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). In short, "'Rule 23(a)(2) asks whether there are issues common to the class,' and 'Rule 23(b)(3) asks whether these common questions predominate.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010)).

There are undoubtedly common and substantial questions here, such as whether Defendant's conduct in emitting particulate matter and odor into the surrounding neighborhood fell below the standard of care. However, that does not end the inquiry, because individual issues may still predominate over such common questions. Whether "questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Olean*, 31 F.4th at 665 (quotation omitted). Defendant contends that Plaintiff has not met the predominance requirement because the key elements of liability for all his claims—harm, causation, and damages—will require individualized evidence. *See* Dkt. No. 92 at 1–2, 10–20. The Court finds that for purposes of this inquiry, the critical element in each of Plaintiff's claims is whether Defendant's conduct caused Plaintiff and putative class members harm or injury.[5] It is

---

[5] This is distinct from the concept of individual *damages* calculations, which would not preclude the Court from certifying the class. *See Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("The amount of damages is invariably an individual question and does not defeat class action treatment.") (quotation omitted); *cf. Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139–40 (9th Cir. 2022) (distinguishing between damages and injury, which the court described as "a merits issue").

6

1  Plaintiff's burden to prove that he can establish this element with class-wide proof. And without
2  such proof, a purported class action would instead devolve into thousands of individual inquiries
3  as to whether Plaintiff and putative class members were harmed by Defendant's conduct.

4  **Public and Private Nuisance.** Under California law, a nuisance is "[a]nything which is
5  injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of
6  property, so as to interfere with the comfortable enjoyment of life or property . . . ." Cal. Civ.
7  Code § 3479. Public nuisances "affect[] at the same time an entire community or
8  neighborhood . . . ." *Id.* § 3480. Every nuisance that is not a public nuisance is a private one. *See*
9  Cal. Civ. Code § 3481. The elements therefore are largely the same. As relevant here, to establish
10 either a public or a private nuisance claim, Plaintiff must prove that Defendant created a condition
11 that was harmful to health or interfered with the comfortable enjoyment of life or property.[6] *See*
12 *Birke v. Oakwood Worldwide*, 169 Cal. App. 4th 1540, 1548 (Cal. Ct. App. 2009); *Mendez v.*
13 *Rancho Valencia Resort Partners, LLC*, 3 Cal. App. 5th 248, 262–63 (Cal. Ct. App. 2016). The
14 interference with property, as alleged here, must be "substantial and unreasonable." *See Mendez*,
15 3 Cal. App. 5th at 262 (quotation omitted). The degree of harm is measured by an objective
16 standard: "the effect . . . the invasion [would] have on persons of normal health and sensibilities
17 living in the same community." *Id.* at 263 (quotation omitted) (alterations in original).

18 **Negligence.** Under California law, "[e]veryone is responsible . . . for an injury occasioned
19 to another by his or her want of ordinary care or skill in the management of his or her
20 property . . . ." Cal. Civ. Code § 1714(a). And to establish a negligence claim, Plaintiff likewise
21 must prove, *inter alia*, that he was harmed by Defendant's breach of duty.[7] *See Romero v. Los*

---

[6] A public nuisance claim requires a plaintiff to prove: (1) the defendant "created a condition that was harmful to health" or "interfere[d] with the comfortable enjoyment of life or property"; (2) "the condition affected a substantial number of people at the same time"; (3) "an ordinary person would be reasonably annoyed or disturbed by the condition"; (4) "the seriousness of the harm outweighs the social utility" of the defendant's conduct; (5) the plaintiff did not consent to the conduct; (6) the plaintiff "suffered harm that was different from the type of harm suffered by the general public"; and (7) the defendant's conduct "was a substantial factor" in causing plaintiff's harm. *See Birke*, 169 Cal. App. 4th at 1548. A plaintiff asserting a private nuisance, however, does not have to prove that the nuisance is one that affects a community or neighborhood and that they suffered a special injury. See *Mendez*, 3 Cal. App. 5th at 262.

[7] A negligence claim requires a plaintiff to prove: (1) the existence of a duty; (2) a breach of that duty; (3) injury to the plaintiff caused by the defendant's breach; and (4) actual damages. *See*

7

*Angeles Rams*, 91 Cal. App. 5th 562, 567 (Cal. Ct. App. 2023); *see also Aas v. Superior Ct.*, 24 Cal. 4th 627, 646 (Cal. 2000), *superseded by statute on other grounds*, Civ. Code, §§ 895 *et seq.* (recognizing "that appreciable, nonspeculative, present injury is an essential element of a tort cause of action").

**Trespass.** During the hearing on the motion, Plaintiff's counsel suggested that his trespass claim was distinct from the nuisance and negligence claims. However, a trespass claim still generally requires Plaintiff to prove that he and putative class members were harmed by Defendant's emissions.[8] *See Ralphs Grocery Co. v. Victory Consultants, Inc.*, 17 Cal. App. 5th 245, 262 (Cal. Ct. App. 2017). Plaintiff does not directly address the need to establish "harm" for purposes of his trespass claim. *See generally* Dkt. Nos. 83, 103. Instead, he briefly notes that a plaintiff may be entitled to nominal damages even if he does not claim any injury to his property. *See* Dkt. No. 103 at 9 (citing *In re Burbank Env't Litig.*, 42 F. Supp. 2d 976, 983 (C.D. Cal. 1998)). Although he does not clarify this point, Plaintiff's argument relies on the suggestion that the existence of any tangible dust on the putative class's residential properties is enough on its own to establish liability for trespass.

It is true that California courts have recognized that "every trespass is an invasion of a legal right of another and carries with it the right to nominal damages." *See Costerisan v. Tejon Ranch Co.*, 255 Cal. App. 2d 57, 60 (Cal. Ct. App. 1967); *cf. Sefton v. Prentice*, 103 Cal. 670, 674 (Cal. 1894) ("[A] man has no right to commit a trespass upon the property of another because, in the opinion of the trespasser or of a court, it would do the owner of the property no harm."). But at least as currently alleged, Plaintiff is not seeking nominal damages in this case. *See generally* FAC at 26–27 ("Prayer for Relief") (requesting compensatory damages). Rather, he alleges as part of his trespass claim that he and putative class members "suffered harm," such as needing to remain indoors, as well as physical damage to their properties. *See id.* at ¶ 115; *see also* Dkt. No.

---

*Romero*, 91 Cal. App. 5th at 567.

[8] A trespass claim requires a plaintiff to prove: (1) he owns or controls the property; (2) the defendant negligently, recklessly, or intentionally caused something tangible to enter the plaintiff's property, (3) without the plaintiff's permission; and (4) the defendant's conduct was a substantial factor in causing (5) *the plaintiff's harm*." *See Ralphs*, 17 Cal. App. 5th at 262 (emphasis added).

103 at 9 (stating that "[t]he question is whether the physical invasion of dust into private property constitutes harm"). Plaintiff's trespass claim, like his nuisance and negligence claims, therefore, still requires consideration of harm.

For purposes of predominance, the Court thus considers whether Plaintiff can present common, class-wide proof to establish harm. Plaintiff largely sidesteps this issue in his briefing, focusing on the efficiency gains of a class action under these circumstances and noting that individualized damages questions may be resolved later. *See, e.g.*, Dkt. No. 83 at 21–24. But as discussed above, harm is an element of Plaintiff's claims, and is distinct from the amount of damages any individual class member may be entitled to if they ultimately succeed in establishing liability. *See Lara*, 25 F.4th at 1139–40. Plaintiff also emphasizes the objective standard that applies when evaluating nuisance and trespass claims. *See* Dkt. No. 83 at 23; Dkt. No. 103 at 2. But critically, even if evaluated under an objective standard, Plaintiff does not discuss what common proof he would use to satisfy this element. Plaintiff points out that Defendant has not provided its own, contrary evidence that the putative class was unharmed. *See* Dkt. No. 103 at 7–8. But this is Plaintiff's motion, and he bears the burden of proving that class certification is appropriate.

There is no doubt that Plaintiff has provided ample evidence at this stage that Defendant has repeatedly released particulate matter from the refinery. But Plaintiff has not proved that he can show on a class-wide basis that these emissions—alone or collectively—caused harm. Taking the nuisance claims, for example, Plaintiff must show that Defendant's emissions caused substantial interference with the comfortable enjoyment of class members' property. When pressed during the hearing about what common evidence Plaintiff intends to use to show substantial interference for everyone, counsel did not point to any specific evidence. Instead, counsel emphasized Defendant's conduct rather than Plaintiff's harm: evidence demonstrating the frequency of the emissions and the fact that Defendant is not using the best available technology to prevent the emissions. This is not common proof of harm.

Although Plaintiff does not emphasize this evidence as common proof of harm, he has presented a preliminary report from his expert, Dr. Cal, and the BAAQMD air quality modeling

conducted after the November 2022 incident. *See* Dkt. No. 83 at 13, 23; Dkt. No. 103 at 3–4. But Plaintiff has not proved that either could provide the kind of class-wide proof of harm necessary to establish predominance at this stage.

Dr. Cal conducted preliminary "atmospheric dispersion modeling" to show how particulate matter is dispersed from the refinery into the surrounding area. *See generally* Cal Report. He did not model the dispersion of spent catalyst or coke dust, but instead looked at particulate matter 2.5 micrometers or smaller ("PM-2.5") and particulate matter 30 micrometers or larger ("PM-30"). *Id.* Dr. Cal concludes that his modeling "displayed elevated PM dispersion and deposition throughout the entire proposed class area." *Id.* at 14. In other words, Dr. Cal concluded that some amounts of PM 2.5 and PM 30 were "transport[ed] . . . throughout the proposed class area." *See id.* at 19. But his report is limited. Dr. Cal's report explicitly states that he did not model the "extent, severity, and frequency of the defendant's emissions." *Id.* at 14. During his deposition, Dr. Cal further clarified that his modeling showed "variability in [particulate matter] concentrations across the proposed class area." *See* Dkt. No. 92-1, Ex. 7 at 373, 377 (110:9–16, 170:2–8).

Plaintiff does not engage with this variability or explain why it would not undermine the use of Dr. Cal's modeling as common proof of harm. Like Plaintiff, the Court rejects Defendant's argument that individual differences in how putative class members *responded* to the emissions preclude class treatment. *See* Dkt. No. 103 at 9. But Dr. Cal's report itself suggests that the nature and scope of the emissions varied across the class area and thus across the thousands of properties owned or rented by members of the proposed class. Defendant's expert confirms this variability, and explains that it is due to a variety of factors such as particle size, wind speed and direction, precipitation, and the existence of large structures, trees, and vegetation. *See* Dkt. No. 92-1, Ex. 2 at 18–20.

In his report, Dr. Cal states that "[a] more detailed atmospheric dispersion modeling analysis" could "determine the intensity and location of nuisance-level particulate matter (dust) deposition and/or odor dispersion within the proposed class area." *See* Cal Report at 19. Such future modeling, he contends, "would allow for a determination of properties that may be

10

impacted by particulate material and/or odor emissions from the facility and to what extent." *See id.* But he did not do this work in the report presented to the Court, and did not explain how he would do it moving forward, or how such results might impact the proposed class area.[9] The BAAQMD's analysis likewise indicates that following the November 2022 release, dust was observed throughout the class area. *See* Dkt. No. 83-12, Ex. 12 at 2–4 (BAAQMD Summary Report). Its modeling of the incident also reflects dust concentrations exceeding 0.1 $g/m^2$ in the class area. *See id.* at 6–8. But here too, the modeling shows some variability. *Id.* The report states that the "main area with total deposition exceeding 0.1 $g/m^2$ extends about 8k to the west-southwest of MRC." *See id.* at 7. The report also states that the modeling was designed "to identify candidate areas for soil sampling," and "does not show areas of community impact." *See id.* at 6, 7.

Even assuming future modeling could demonstrate the extent, scope, and frequency of the emissions, and even assuming there was no meaningful variability across the class area, Plaintiff still has not explained how he intends to establish harm from this exposure level on a class-wide basis. Whether Plaintiff can ultimately establish that any individual class member suffered harm from the emissions is a merits question not before the Court at this stage. But whether Plaintiff will be able to prove such harm with class-wide proof is a class certification question. And Plaintiff has not presented adequate evidence of such proof. Even as alleged in the FAC, the currently-asserted harm seems highly individualized. Plaintiff notes, for example, that the emissions substantially interfered with his and class members' use and enjoyment of their properties by causing property damage "through chipping, pitting, sedimentation, corrosion, destruction, and waste to gardens, lawns, soil, and other flora . . . ." *See* FAC at ¶ 85. But there is nothing before the Court to suggest that Defendant's emissions caused such harm across the thousands of properties in the class area. Plaintiff appears to assume that Defendant's emissions are inherently harmful. While that might someday be capable of being proved, this blanket

---

[9] The Court also notes that neither Dr. Cal's nor BAAQMD's reports modeled the distribution of odor from the refinery. There is thus no discussion of the common proof that could be used to establish harm based on noxious odors.

11

1    assumption cannot establish by a preponderance of the evidence that common issues predominate
2    over individualized ones.
3          The Court acknowledges the challenges inherent in adjudicating these issues on a parcel-
4    by-parcel basis.  But resolving the critical element of injury appears to require just that:
5    consideration of individualized issues that necessarily would eclipse any common ones.  Plaintiff
6    has not met his burden of establishing that the requirements of Rule 23 are met here, and the Court
7    therefore **DENIES** the motion for class certification.  Dkt. No. 83.

### IV.    MOTIONS TO SEAL

#### A.    Legal Standard

Courts generally apply a "compelling reasons" standard when considering motions to seal documents.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).  "This standard derives from the common law right 'to inspect and copy public records and documents, including judicial records and documents.'"  *Id.* (quoting *Kamakana*, 447 F.3d at 1178).  "[A] strong presumption in favor of access is the starting point."  *Kamakana*, 447 F.3d at 1178 (quotations omitted).  To overcome this strong presumption, the party seeking to seal a judicial record attached to a dispositive motion must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process" and "significant public events."  *Id.* at 1178–79 (quotations omitted).  "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets."  *Id.* at 1179 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).  "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records."  *Id.*

The Court must "balance[] the competing interests of the public and the party who seeks to keep certain judicial records secret.  After considering these interests, if the court decides to seal

1  certain judicial records, it must base its decision on a compelling reason and articulate the factual
2  basis for its ruling, without relying on hypothesis or conjecture." *Id.*  Civil Local Rule 79-5
3  supplements the compelling reasons standard set forth in *Kamakana*:  the party seeking to file a
4  document or portions of it under seal "must explore all reasonable alternatives to filing documents
5  under seal, minimize the number of documents filed under seal, and avoid wherever possible
6  sealing entire documents . . . ."  Civil L.R. 79-5(a).  The party must further explain the interests
7  that warrant sealing, the injury that will result if sealing is declined, and why a less restrictive
8  alternative to sealing is not sufficient.  *See* Civil L.R. 79-5(c).

Records attached to nondispositive motions must meet the lower "good cause" standard of Rule 26(c) of the Federal Rules of Civil Procedure, as such records "are often unrelated, or only tangentially related, to the underlying cause of action."  *See Kamakana*, 447 F.3d at 1179–80 (quotations omitted).  However, because the motion for class certification is more than tangentially related to the merits of the underlying action, the Court applies the "compelling reasons" standard in evaluating the motions to seal.

**B.    Discussion**

In conjunction with his motion for class certification, Plaintiff filed two motions to consider whether another party's material should be sealed under Civil L.R. 79-5(f).  Dkt. Nos. 96, 106.  The two motions seek to seal the same material:  four exhibits filed in support of the motion for class certification and portions of Plaintiff's motion for class certification that reference these documents.[10]  Plaintiff explained that Defendant had designated these documents as confidential during discovery.  *See* Dkt. Nos. 96, 106.

As required under Civil L.R. 79-5(f)(3), Defendant filed a declaration in support of the motions to seal.  Dkt. No. 97.  Defendant seeks to seal a narrower subset of the documents. Defendant does not request to seal any portions of Plaintiff's motion for class certification or Exhibit 31.  The Court therefore **DENIES** the motions to seal as to these documents.  Defendant

---

[10] The Court found that the initial motion to seal, Dkt. No. 96, did not comply with all the requirements of Civil L.R. 79-5 and directed Plaintiff to file an amended motion.  *See* Dkt. No. 105.

13

1  seeks to seal Exhibit 29 and Exhibit 30 in their entirety, as well as a portion of Exhibit 26.

2  Exhibit 29 and Exhibit 30 are confidential settlement agreements that Defendant
3  previously obtained from Martinez residents. Defendant seeks to seal these two exhibits in their
4  entirety, arguing that they provide sensitive and non-public information about the company's
5  litigation strategy and personally identifiable information about those who entered into the
6  agreements. *See* Dkt. No. 97 at ¶¶ 17–18. They include, for example, information about the
7  specific settlement terms, including the amounts paid to each individual. The agreements also
8  contain the names and contact information for the individuals who entered into the agreements
9  with Defendant. Plaintiff cites these documents broadly in support of his assertion that Martinez
10 residents in the proposed class area have experienced adverse impacts due to Defendant's conduct.
11 However, the specifics of these releases were not germane to the Court's predominance analysis
12 above, and the public's interest in these documents is minimal. The disclosure of this information,
13 on the other hand, would reveal confidential information about Defendant's settlement
14 negotiations and litigation strategy, and would disincentivize settlements. *See Celgard, LLC v.*
15 *Targray Tech. Int'l Inc.*, No. 19-CV-02401-VKD, 2019 WL 3841997, at *2–3 (N.D. Cal. Aug. 15,
16 2019) ("[C]ourts have long recognized the general policy of protecting settlement negotiations and
17 communications in order to promote settlement.") (collecting cases).

18 Similarly, Exhibit 26 is a spreadsheet that contains communications that Defendant had
19 with Martinez residents in November 2022 following a catalyst release. Defendant only seeks to
20 redact the personally identifiable information of the individuals with whom Defendant
21 communicated, specifically their name, phone number, and email address. The Court did not rely
22 on the spreadsheet, particularly the identity of any of the individuals, in deciding the motion for
23 class certification either. The information is thus unrelated to the public's understanding of the
24 judicial proceedings in this case, and the public's interest in disclosure of this information is
25 minimal.

26 Because the documents divulge sensitive information unrelated to the public's
27 understanding of the judicial proceedings in this action,ced the Court finds that there are compelling
28 reasons to seal them. The Court therefore **GRANTS** the motions to seal as to Exhibits 29 and 30,

and the portions of Exhibit 26 that Defendant identified.[11]  Dkt. Nos. 96, 106.  Pursuant to Civil Local Rule 79-5(g)(1), documents filed under seal as to which the administrative motion is granted will remain under seal.

## V. CONCLUSION

The Court **DENIES** the motion for class certification.  Dkt. No. 83.  The Court **GRANTS IN PART** and **DENIES IN PART** the motions to seal.  Dkt. Nos. 96, 106.  Plaintiff is **DIRECTED** to file an unredacted version of the motion for class certification and Exhibit 31, for which the proposed sealing has been denied, as well as Exhibit 28 in support of his motion, for which a motion to seal was never filed, within seven days of this order.

The Court further **SETS** a case management conference in this case and all related cases on October 28, 2025, at 2:00 p.m.  The hearing will be held by Public Zoom Webinar.  All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg.  All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities.  The Court **DIRECTS** all parties in the related cases to meet and confer and file a joint case management statement by October 21, 2025.

**IT IS SO ORDERED.**

Dated: 9/30/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[11] The Court notes that portions of Plaintiff's Exhibit 28, the declaration of Matthew Roman, are also redacted.  *See* Dkt. No. 83-28, Ex. 28.  Plaintiff did not file a motion to seal as to this exhibit and these redactions are improper.  The Court therefore **DIRECTS** Plaintiff to file an unredacted version of Exhibit 28 within seven days of this order.

15